498 A.2d 269

**John J. MINER**

v.

**Joseph A. NOVOTNY.**

**No. 141, Sept. Term, 1984.**

Court of Appeals of Maryland.

Argued May 7, 1985.

Reargued Sept. 11, 1985.

Decided Oct. 4, 1985.

Allen G. Windsor, Baltimore (David S. Harris, Baltimore, on brief), for appellant.

Theodore Sherbow, Baltimore (Henry R. Abrams, Michael P. Smith and Weinberg & Green, Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

Reargued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

MURPHY, Chief Judge.

We granted certiorari in this case to decide whether a law enforcement officer against whom a brutality complaint has been filed may maintain a defamation action against the complainant based upon the contents of the complaint.

### I.

On July 14, 1982, Joseph A. Novotny was arrested by John J. Miner, a deputy sheriff for Harford County, and charged with driving while intoxicated in violation of Maryland Code (1977, 1982 Cum.Supp.), § 21–902 of the Transportation Article. The arrest was apparently not a peaceful one. Although the record is not entirely clear, it appears that Novotny was also charged with assaulting Miner. Two days after his arrest, Novotny filed a "Complaint of Brutality" with the Harford County Sheriff's Office, alleging that he had been kicked, choked, and otherwise abusively treated by Miner during and after the arrest.

Upon receiving Novotny's complaint, the sheriff's office conducted an internal investigation and concluded that Miner was not guilty of any misconduct. Miner then brought suit against Novotny in the Circuit Court for Harford County, asserting three bases for recovery: (1) defamation, based on the contents of the brutality complaint; (2) intentional infliction of emotional distress; and (3) malicious

abuse of civil administrative proceedings. Novotny's demurrer was sustained without leave to amend as to each of the three counts. On appeal, Miner sought review only of the defamation count. The Court of Special Appeals affirmed the circuit court's judgment, holding that the brutality complaint constituted a petition for redress of grievances and that Novotny was therefore insulated from defamation liability by an absolute immunity provided by the Petition Clause of the First Amendment to the United States Constitution.[1]  *Miner v. Novotny,* 60 Md.App. 124, 481 A.2d 508 (1984).

## II.

For reasons of public policy, the law of defamation recognizes certain communications as privileged, and thereby affords those who publish such communications immunity from liability.  The privilege, and the resultant immunity enjoyed by the publisher, may be either absolute or qualified.  As we explained in *DiBlasio v. Kolodner,* 233 Md. 512, 197 A.2d 245 (1964), "[a]n absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused."  233 Md. at 522, 197 A.2d 245. *See also Adams v. Peck,* 288 Md. 1, 3, 415 A.2d 292 (1980) ("absolute privilege protects the person publishing the defamatory statement from liability even if his purpose or motive was malicious, he knew that the statement was false, or his conduct was otherwise unreasonable"); *Orrison v. Vance,* 262 Md. 285, 292, 277 A.2d 573 (1971) (qualified privilege "must be exercised in a reasonable manner and for a proper purpose" or the speaker "will forfeit his

---

**1.** The Petition Clause provides that "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances."

immunity"); Note, *Developments in the Law—Defamation,* 69 Harv.L.Rev. 875, 917 (1956).

The case before us raises questions regarding the nature and scope of two distinct privileges:[2] the constitutionally-based privilege attaching to petitions to the government for redress of grievances, and the common law privilege attaching to testimony in administrative proceedings. We will address each of these privileges separately.

A. Constitutionally-Based Privilege for Petitions to the Government for Redress of Grievances

As indicated earlier, the Court of Special Appeals concluded that Novotny's brutality complaint was protected by an absolute privilege provided by the Petition Clause of the First Amendment to the United States Constitution. In so doing, the court followed the interpretation of the Petition Clause developed in its recent decisions in *Sherrard v. Hull,* 53 Md.App. 553, 456 A.2d 59, *aff'd per curiam,* 296 Md. 189, 460 A.2d 601 (1983), and *Bass v. Rohr,* 57 Md.App. 609, 471 A.2d 752, *cert. dismissed,* 301 Md. 641, 484 A.2d 275 (1984).

The central issue addressed in *Sherrard* was whether allegedly defamatory remarks made during an open meeting of a board of county commissioners were absolutely privileged under the Petition Clause. In an opinion which we later adopted, the Court of Special Appeals carefully surveyed the relevant case law and concluded that the question of whether the petitioning privilege should be absolute or qualified had resulted in a split of authority.

---

**2.** In a Supplemental Brief, Novotny raises a third basis for absolute privilege. He maintains that "Maryland's common law establishes an absolute privilege from suit for petitions for redress addressed to the legislative, judicial and executive branches of government." Because the alleged common law privilege was not raised before the circuit court in Novotny's demurrer, it has not been preserved for appellate review. *See* Md.Rule 885; *Zellinger v. CRC Development Corp.,* 281 Md. 614, 620, 380 A.2d 1064 (1977); *Devereux v. Berger,* 264 Md. 20, 31, 284 A.2d 605 (1971).

Following what it viewed as "[t]he modern, better reasoned cases," 53 Md.App. at 572, 456 A.2d 59, the court held that

> "remarks made by an individual in the course of petitioning for a redress of grievances before a legislative body are absolutely privileged under the First Amendment to the United States Constitution. So long as the individual's comments are not part of a sham and are relevant to his petition and thus are uttered as a part of or in conjunction with it, he may not be held liable in damages for defamation." *Id.* at 555, 456 A.2d 59.

This absolute privilege was held in *Bass* to extend as well to the contents of a consumer's complaint filed with the Maryland Home Improvement Commission, the administrative agency charged with the licensing of home improvement contractors. 57 Md.App. at 619–21, 471 A.2d 752.

The recent decision of the Supreme Court of the United States in *McDonald v. Smith*, —— U.S. ——, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985), necessitates our reappraisal of the interpretation of the Petition Clause set forth in *Sherrard* and *Bass*. *McDonald* was a libel action brought by an unsuccessful candidate for the position of United States Attorney. The defendant allegedly had written several letters containing defamatory statements disparaging the candidate's performance of his duties as a Superior Court judge. Copies of the letters had been mailed to the President and other federal government officials. Although acknowledging the vital role of the right to petition in our system of self-government, the Court concluded that the framers of the Petition Clause never intended it to provide absolute immunity from defamation liability:

> "To accept petitioner's claim of absolute immunity would elevate the Petition Clause to special First Amendment status. The Petition Clause, however, was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble..... These First Amendment rights are inseparable, ... and there is no sound basis for granting greater constitutional protec-

tion to statements made in a petition to the President than other First Amendment expressions."

—— U.S. at ——, 105 S.Ct. at 2791 (citations omitted).

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court first recognized a constitutionally-mandated qualified privilege in the field of defamation law. The qualified privilege identified in *New York Times,* which was applied in that case to protect defamatory statements concerning the official conduct of a public official, was held to arise from the First Amendment freedoms of speech and press. 376 U.S. at 264, 84 S.Ct. at 717. The contours of this privilege have been expanded and refined in a line of subsequent Supreme Court decisions, which we have reviewed at length on numerous occasions. *See, e.g., Capital-Gazette Newspapers, Inc. v. Stack,* 293 Md. 528, 537–40, 445 A.2d 1038, *cert. denied,* 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982); *Berkey v. Delia,* 287 Md. 302, 314–22, 413 A.2d 170 (1980); *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 584–94, 350 A.2d 688 (1976); *A.S. Abell Co. v. Barnes,* 258 Md. 56, 58–70, 265 A.2d 207 (1970), *cert. denied,* 403 U.S. 921, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971).

In light of *McDonald,* the qualified privilege recognized in *New York Times* and its progeny constitutes the extent of the constitutionally-mandated protection of the First Amendment right to petition the government for redress of grievances. To the extent that they are inconsistent with *McDonald* and this opinion, *Sherrard* and *Bass* are no longer authoritative rulings.

B. Common Law Privilege for Testimony in Administrative Proceedings

■ In Maryland, a witness who testifies in the course of judicial proceedings is protected by an absolute privilege against liability for defamatory statements made during the testimony. *Adams, supra,* 288 Md. at 3, 415 A.2d 292; *Korb v. Kowaleviocz,* 285 Md. 699, 701–04, 402 A.2d 897

(1979).   In *Korb*, we reaffirmed our adherence to the so-called English Rule, followed in a minority of American jurisdictions, under which the protection of this immunity is not dependent upon the relevance of the testimony to the subject matter of the judicial proceeding.   285 Md. at 701–04, 402 A.2d 897.

The absolute privilege for judicial testimony is based upon sound considerations of public policy.   As our predecessors observed in *Hunckel v. Voneiff,* 69 Md. 179, 187, 14 A. 500 (1888), "it is of the greatest importance to the administration of justice that witnesses should go upon the stand with their minds absolutely free from apprehension that they may subject themselves to an action of slander for what they may say while giving their testimony." *See also Adams, supra,* 288 Md. at 5, 415 A.2d 292.   The absolute nature of this privilege is intended "not merely to protect the witness from ultimate liability, but to protect him from the annoyance of suit itself." *Gersh v. Ambrose,* 291 Md. 188, 192, 434 A.2d 547 (1981).

◼ The absolute privilege extends not only to oral testimony given in open court, but also to statements contained in documents which have been filed in a judicial proceeding. *DiBlasio, supra,* 233 Md. at 522, 197 A.2d 245; *Bartlett v. Christhilf,* 69 Md. 219, 227, 14 A. 518 (1889).   Statements contained in documents prepared for possible use in a pending judicial proceeding, but never actually filed in the proceeding, are similarly shielded by absolute immunity. *Adams, supra,* 288 Md. at 8–9, 415 A.2d 292.   *See generally* Annotation: *Libel and Slander: Application of Privilege Attending Statements Made in Course of Judicial Proceedings to Pretrial Deposition and Discovery Procedures,* 23 A.L.R.3d 1172 (1969).   Professors Prosser and Keeton have suggested that "an informal complaint to a prosecuting attorney or a magistrate is to be regarded as an initial step in a judicial proceeding, and so entitled to an absolute, rather than a qualified immunity." W. Prosser &

W. Keeton, *The Law of Torts*, § 114, at 819–20 (5th ed. 1984) (citations omitted).

In *Gersh, supra,* we addressed for the first time the question of whether the absolute privilege afforded judicial testimony should extend as well to defamatory statements made in the course of administrative proceedings. The allegedly defamatory statements in that case were published by a witness testifying at a public hearing before the Baltimore City Community Relations Commission. In the ensuing defamation action, the defendant maintained that his testimony before the Commission was protected by an absolute privilege.

After reviewing the relevant case law from other jurisdictions, we concluded that

"[t]he nature and scope of such proceedings are too varied to be circumscribed by specific criteria. Rather, [the question of] whether absolute witness immunity will be extended to any administrative proceeding will have to be decided on a case-by-case basis and will in large part turn on two factors: (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements." 291 Md. at 197, 434 A.2d 547.

Applying these principles to the facts of that case, we observed that the Commission's hearing—which was essentially an "ordinary open public meeting"—lacked the procedural safeguards traditionally provided in judicial proceedings. Furthermore, we found that "[t]he public benefit to be derived from testimony at Commission hearings of this type is not sufficiently compelling to outweigh the possible damage to individual reputations to warrant absolute witness immunity." *Id.* at 196, 434 A.2d 547. We therefore declined to extend absolute immunity to the defendant's testimony before the Commission.

### III.

By filing his sworn brutality complaint with the Harford County Sheriff's Office, Novotny initiated an ad-

ministrative disciplinary proceeding governed by Maryland Code (1957, 1982 Repl.Vol.), Art. 27, §§ 727–734D, generally known as the "Law-Enforcement Officers' Bill of Rights" (the "LEOBR"). The LEOBR was enacted by the General Assembly in 1974, and was designed to provide a law-enforcement officer covered by the statute with substantial procedural safeguards during any inquiry into his conduct which could lead to the imposition of a disciplinary sanction. *DiGrazia v. County Exec. for Mont. Co.*, 288 Md. 437, 452, 418 A.2d 1191 (1980). *See also Chief, Mont. Police v. Jacocks*, 50 Md.App. 132, 135, 436 A.2d 930 (1981); *Abbott v. Administrative Hearing Bd.*, 33 Md.App. 681, 682, 366 A.2d 756 (1976), *cert. denied*, 280 Md. 727 (1977). As a deputy sheriff in Harford County, Miner clearly was covered by the LEOBR.[3]

The administrative proceeding contemplated by the LEOBR was well summarized in *Jacocks:*

"The law ... looks to what is essentially a two-phase administrative process. The first phase involves an internal investigation to determine whether there is some substance to the complaint or suspicion. If it appears that there is, a recommendation for some disciplinary action is made. At that point, phase two begins—an adjudicatory hearing before a departmental hearing board to determine (1) whether the charge itself is valid, and (2) if so, what the punishment should be. If the board finds the officer innocent of the charge, that ends the proceeding. If it finds him guilty, it then makes a recommendation to the chief of police as to an appropriate punishment. The chief is bound by a determination of innocence, but not a proposed punishment in the event of a

---

**3.** Section 727(b) of the LEOBR defines "law-enforcement officer" to include

"any person who, in his official capacity, is authorized by law to make arrests and who is a member of one of the following law-enforcement agencies:

(5) The office of the sheriff of any county."

finding of guilt. As to that, his decision (rather than that of the Board) is final." 50 Md.App. at 135, 436 A.2d 930.

As we indicated in *Gersh*, the availability of absolute immunity to witnesses in administrative proceedings depends to a large extent upon "the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements." 291 Md. at 197, 434 A.2d 547. The procedural safeguards provided by the LEOBR in this case are, we believe, entirely adequate in this regard.

Under the statute, no brutality complaint may be investigated by a law-enforcement agency unless the complaint is duly sworn to by the aggrieved person, a member of the aggrieved person's immediate family, a person with first-hand knowledge of the alleged incident, or the parent or guardian in the case of a minor child. § 728(b)(4). A person who knowingly makes a false complaint is subject to criminal liability. § 734C. Prior to any interrogation, the law-enforcement officer under investigation must be informed in writing of the nature of the investigation. § 728(b)(5). The officer under investigation must also be informed of the name, rank, and command of the officer in charge of the investigation, the interrogating officer, and all persons present during the interrogation. § 728(b)(3). At all times during the interrogation, the officer under investigation has the right to be represented by counsel. § 728(b)(10). A complete record of the interrogation must be kept, and must be made available to the officer upon request at the completion of the investigation, and at least ten days before any hearing. § 728(b)(8).

If at the conclusion of the investigatory phase of the proceeding disciplinary sanctions are recommended, the officer under investigation must be given notice of his right to a hearing. The notice must inform the officer of the issues involved, as well as of the time and place of the hearing. § 730(a). At least ten days before the hearing, the officer under investigation must also be notified of the names of all witnesses. § 728(b)(5).

The hearing phase of the proceeding is adversarial in nature. The hearing is ordinarily conducted before a board of at least three officers, none of whom had any role in the investigatory phase of the proceeding. §§ 730(b), 727(d). The law-enforcement agency and the officer under investigation each have the right to be represented by counsel, and each must be given an adequate opportunity to present its case. § 730(b).

Each party may request that the hearing board issue summonses compelling the attendance and testimony of witnesses, and the production of documents. § 730(h)(1). The hearing board's summons may be enforced, in the proper circumstances, by an order of the circuit court. Failure to obey the court order is punishable as a contempt of court. § 730(h)(2). Witnesses must testify under oath, and are subject to criminal penalties for knowingly giving false testimony. §§ 730(f), 734C. Each party has the right to cross-examine witnesses, and to submit rebuttal evidence. § 730(d).

Although the formal rules governing the admissibility of evidence in a judicial proceeding do not apply, "[t]he hearing board conducting the hearing shall give effect to the rules of privilege recognized by law, and shall exclude incompetent, irrelevant, immaterial, and unduly repetitious evidence." § 730(c). An official record of the hearing must be maintained, and must include all evidence, both testimonial and real, introduced during the hearing. § 730(a), (c).

If the officer is exonerated of all charges contained in the complaint, he may require the law-enforcement agency to expunge from its files any record of the complaint three years after the investigation is completed. § 728(12)(ii). Furthermore, no adverse material may be inserted into the officer's file until the officer receives a copy of the adverse material and has an opportunity to review it, comment upon it in writing, and sign it. § 728(12)(i).

## IV.

Our society vests its law-enforcement officers with formidable power, the abuse of which is often extremely detrimental to the public interest. Citizen complaints of such abuses, and the administrative disciplinary procedure which has been developed to investigate these complaints, serve a public function of vital importance by providing a mechanism through which abuses may be reported to the proper authorities, and the abusers held accountable.

The viability of a democratic government requires that the channels of communication between citizens and their public officials remain open and unimpeded. Were complaints such as Novotny's not absolutely privileged, the possibility of incurring the costs and inconvenience associated with defending a defamation suit might well deter a citizen with a legitimate grievance from filing a complaint. We therefore conclude that the possible harm a false brutality complaint may cause to a law-enforcement officer's reputation, despite the procedural safeguards provided by the LEOBR, is outweighed by the public's interest in encouraging the filing and investigation of valid complaints. Most other courts that have considered this issue have reached the same conclusion. *See, e.g., Putter v. Anderson,* 601 S.W.2d 73, 76–77 (Tex.Civ.App.1980) (citizen's complaints of police misconduct were absolutely privileged); *Campo v. Rega,* 79 A.D.2d 626, 433 N.Y.S.2d 630, 631 (N.Y.App.Div.1980), *motion for leave to appeal denied,* 52 N.Y.2d 705, 437 N.Y.S.2d 1028, 419 N.E.2d 876 (1981) (same); *Larkin v. Noonan,* 19 Wis. 93, 98 (1865) (citizen's complaint of sheriff's misconduct was absolutely privileged). *Cf. Pena v. Municipal Court,* 96 Cal.App.3d 77, 82–83, 157 Cal.Rptr. 584 (Cal.Ct.App.1979) (citizen's complaint of police misconduct was protected by absolute statutory privilege); *Imig v. Ferrar,* 70 Cal.App.3d 48, 55–56, 138 Cal.Rptr. 540 (Cal.Ct.App.1977) (same). *But see Elder v. Holland,* 208 Va. 15, 155 S.E.2d 369, 374–75 (1967) (witness's testimony at police disciplinary hearing was enti-

tled to only a qualified privilege because procedural safe-guards at hearing were inadequate).

Our decision in *Berkey, supra,* is inapposite to the holding we reach today. Although we there permitted a defamation suit based on a citizen's complaint of police misconduct to proceed to trial, the question of an absolute common law privilege was never raised. *Berkey* reached us on an appeal from the trial court's granting of the defendant's motion for summary judgment. The central issue in that case, as in any defamation case by a public official, was whether the plaintiff could prove by clear and convincing evidence the existence of *New York Times* "actual malice" on the part of the defendant. The facts relevant to this issue were in dispute. We held only that where the outcome of a case turns on the credibility of witnesses, as did the outcome in *Berkey,* a motion for summary judgment should not be granted. 287 Md. at 332–33, 413 A.2d 170.

■ We are not unmindful of the deeply disturbing and demoralizing effect a false accusation of brutality may have on a law-enforcement officer. As Judge Eldridge observed in his dissent in *Berkey,* "[n]o one likes to hear, or have his family and friends hear, such allegations." *Id.* at 341, 413 A.2d 170. It is regrettable that our holding here will, in some instances, "afford an immunity to the evil disposed and malignant slanderer." *Bartlett, supra,* 69 Md. at 226, 14 A. 518. We are satisfied, however, that the inhibition of citizens' criticism of those entrusted with their protection is a far worse evil. Accordingly, we hold that a citizen's brutality complaint filed against a law-enforcement officer is protected by the same absolute privilege as are statements made by witnesses in judicial proceedings, and that such complaints cannot, therefore, serve as the basis for a defamation suit.

Because the constitutionally-based privilege provided by the Petition Clause is qualified rather than absolute, the intermediate appellate court erred in upholding Novotny's demurrer on this basis. *See Carr v. Watkins,* 227 Md..578,

585–86, 177 A.2d 841 (1962); *Walker v. D'Alesandro,* 212 Md. 163, 169, 129 A.2d 148 (1957). We will, however, affirm the judgment of the Court of Special Appeals, as the record clearly demonstrates that Novotny's complaint falls within the common law absolute privilege for testimony in administrative proceedings.

JUDGMENT AFFIRMED, WITH COSTS.